**DOYON, LIMITED, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 94–1074T.**

United States Court of Federal Claims.

Nov. 22, 1996.

John M. Mooney, San Francisco, CA, attorney of record for plaintiff.

William K. Drew, Washington, DC, with whom was Assistant Attorney General Loretta C. Argrett, for defendant.

## OPINION

REGINALD W. GIBSON, Senior Judge:

### INTRODUCTION

In this tax refund case, Doyon, Limited (Doyon or plaintiff) seeks a refund of federal corporate income taxes in the total amount of $746,942 [1] assessed by defendant for the year 1988. Doyon is an Alaska Native Corporation (ANC). During the years 1987 and 1988, Doyon entered into several agreements with various corporations to sell its net operating losses (NOLs) and investment tax credits (ITCs), pursuant to § 60(b)(5) of the Deficit Reduction Act of 1984 (DEFRA). The Commissioner of Internal Revenue (Commissioner) reviewed these transactions and *increased* Doyon's adjusted net book income (ANBI), to reflect, in part, the payments Doyon received pursuant to its sales agreements. This increase resulted in the assessment of additional alternative minimum tax

---

1. This represents the total amount at issue in the current motion. In plaintiff's amended complaint, filed May 10, 1995, it pleads three causes of action. The first cause of action is the subject of this partial motion for summary judgment. Alternatively, plaintiff alleges in the second cause of action that it is entitled to a partial refund of its 1988 AMT in the amount of $319,409, because the IRS's determination failed to eliminate a $25 million intercompany payment from consolidated net book income for AMT purposes. In its third cause of action, plaintiff asserts that it is entitled

to $1,047,325 for the year 1990. The parties have, however, reached a settlement as to the third cause of action and await resolution of the first two causes of action in order to determine the plaintiff's tax liability for the year 1990, pursuant to their settlement agreement. First Supp. Stip. ¶ 6. Because we deny plaintiff's motion for partial summary judgment, only the second cause of action remains for disposition by a trial on the merits due to the existence of genuine issues of material fact.

(AMT) and environmental tax liability for the taxable year 1988. Doyon avers that the Commissioner incorrectly took into consideration $70,509,093 (*i.e.*, the Disputed Sum), which Doyon received in connection with the sale of its NOLs and ITCs. Specifically, Doyon contends that § 56(f)(2)(B) of the Internal Revenue Code (I.R.C. or Code) and § 1804(e)(4) of the Tax Reform Act of 1986, require the Commissioner to "disregard" the Disputed Sum from Doyon's ANBI for purposes of determining its AMT and environmental tax liability. Therefore, on or about August 28, 1992, Doyon timely filed an administrative claim for refund of tax and interest respecting the taxable year 1988, which the Government has denied. Subsequently, Doyon filed its original and amended complaint with this court[2] on December 19, 1994, and May 10, 1995, respectively.

This dispute is currently before the court on the parties' cross-motions for partial summary judgment, pursuant to RCFC 56(c). Because we find no dispute concerning any genuine issue of material fact, the court concludes that this issue may be appropriately decided on partial summary judgment motions. Moreover, given the record before the court, we further find that the defendant is entitled to partial summary judgment as a matter of law, for the reasons discussed hereinafter. Therefore, defendant's cross-motion for partial summary judgment is granted, and plaintiff's motion is denied.

Jurisdiction is premised on § 6532(a)[3] and § 7422(a)[4] of the I.R.C. of 1954, and the Tucker Act, 28 U.S.C. § 1491.[5]

### STATUTORY BACKGROUND

In 1971, Congress enacted the Alaskan Native Claims Settlement Act (ANCSA)[6] to provide a combination grant of land and money to the Natives of Alaska, in satisfaction for their Alaska land claims. H.R.Rep. No. 523, 92d Cong., 1st Sess. 3, *reprinted in* 1971 U.S.C.C.A.N. 2192, 2193. Pursuant to the ANCSA, the Alaskan Natives received $962.5 million and 44 million acres of land. 43 U.S.C. §§ 1605 and 1611. To manage these assets for Alaskan Natives, the settlement established 13 regional Alaska Native Corporations (ANCs). 43 U.S.C. § 1611; *see Klukwan, Inc., v. Commissioner,* 68 T.C.M. 446, 447, 1994 WL 444446 (Aug. 18, 1994); *see United States v. Atlantic Richfield Co.,* 435 F.Supp. 1009, 1018 (D.Alaska) (discussing in further detail ANCSA), *aff'd,* 612 F.2d 1132 (9th Cir.1980), *cert. denied,* 449 U.S. 888, 101 S.Ct. 244, 66 L.Ed.2d 113 (1980).

Unfortunately, Congressional delay in granting title to the promised land led to severe financial difficulties for the ANCs. 132 Cong.Rec. S14,946 (June 23, 1986) (statement of Sen. Stevens). To alleviate these

---

**2.** In tax refund disputes, which are *de novo,* the Commissioner's determinations are presumptively correct as a matter of law and the taxpayer carries the heavy burden of overcoming that presumption and establishing error. *Transamerica Corp. v. United States,* 902 F.2d 1540, 1543 (Fed. Cir.1990) (citing *Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933)).

**3.** 26 U.S.C. § 6532 provides in pertinent part: "Suits by taxpayers for refund.—(1) General Rule.—No suit or proceeding under 7422(a) for the recovery of any internal revenue tax, penalty, or other sum, shall be begun before the expiration of 6 months from the date of filing the claim required under such section unless the Secretary or his delegate renders a decision thereon within that time, nor after the expiration of 2 years from the date of mailing by certified mail by the Secretary or his delegate to the taxpayer of a notice of the disallowance of the part of the claim to which the suit or proceeding relates."

**4.** 26 U.S.C. § 7422(a) states in part: "No suit prior to filing claim for refund.—No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary, according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof."

**5.** 28 U.S.C. § 1491(a) (1988) provides in relevant part:

(1) The United States [Court of Federal Claims] shall have jurisdiction to render judgment upon any claim against the United States found either upon the Constitution, or any Act of Congress or any regulation of an executive department. . . .

**6.** Pub.L. 92–203, 85 Stat. 688 (1971), 43 U.S.C. §§ 1601–1629 (1988).

problems, Congress enacted § 60(b)(5) of DEFRA.[7] Section 60(b)(5) temporarily exempted ANCs from certain statutory provisions designed to make it more difficult for unrelated corporations to affiliate for tax-sharing purposes. *Id.* Specifically, ANCs were exempted from the prerequisite 80% equity-ownership requirement for tax consolidation purposes. *Id.* The purpose of § 60(b)(5) was, therefore, to allow Native Corporations to sell their net operating losses (NOLs) and investment tax credits (ITCs) to unrelated profitable corporations in return for a portion of the income sheltered from tax liability. *Id.;* [8] *see Chugach Alaska Corp. v. United States,* 34 F.3d 1462, 1464 (9th Cir.1992). Congress believed "that this *infusion of capital* would allow many Native corporations to put their financial houses in order." 132 Cong.Rec. S14,946 (June 23, 1986) (statement of Sen. Stevens) (emphasis added). This is the statute pursuant to which Doyon formed and executed the transactions at issue.[9]

### FACTS [10]

#### A. Background

Doyon was incorporated on June 16, 1972, pursuant to the Alaska Native Claims Settlement Act (ANCSA) of 1971. Doyon is and was, at times relevant to this action, an ANC. For its taxable year ending (TYE) October 31, 1987, Doyon incurred substantial loss carryforwards, *i.e.,* a total of $237,973,227,[11] from the sale of certain asbestos deposits. During its TYE 1987 and 1988, Doyon en-

tered into several contractual agreements to sell its NOLs and ITCs to unrelated corporations that sought to shelter some of their income from tax liability. These contractual agreements were formed pursuant to § 60(b)(5) of DEFRA. Pursuant to said tax-sharing contracts, the purchasing corporations created so-called "subsidiaries" that became temporary members of an affiliated group of which Doyon was the common parent. During the limited period of affiliation, the purchasing corporations would assign income to their subsidiaries and Doyon would report the income assigned on its consolidated federal income tax returns for its TYE 1987 and 1988, the year in which it obtained a stock interest therein. The unique features of Doyon's contractual agreements with the various corporations, *i.e.,* the Marriott Corporation, the Campbell Soup Company, and the Hilton Hotels Corporation, are discussed in detail below, seriatim.

#### B. The Individual Contractual Agreements

##### 1. Marriott Transaction

On November 13, 1986, Doyon entered into a contract with the Marriott Corporation (Marriott) and a newly-formed subsidiary of Marriott, Second Marigold, Inc. (Marigold).[12] The ultimate goal of this transaction was to enable Marriott to offset certain taxable income by utilizing Doyon's NOLs and ITCs. To that end, the contractual agreement provided that Marigold would become a member

---

**7.** Tax Reform Act of 1984, Pub.L. No. 98–369, 98 Stat. 494, 579. Section 60(b)(5) of DEFRA provided in pertinent part: "The amendments made by subsection (a) [restricting the ability of companies to affiliate for tax purposes] shall not apply to any [Native Corporation] during any taxable year beginning before 1992 or any part thereof. . . ."

**8.** *See* 132 Cong.Rec. S14,946 (June 23, 1986) (statement of Sen. Stevens) ("Congress intended that the exemption would allow a Native corporation to offset the income of a non-Native corporation's profitable subsidiary with its [NOLs] and share the resulting tax benefits with the non-Native corporation.").

**9.** In 1988, Congress repealed the exemption provided for in § 60(b)(5), but provided a grandfather clause for existing contracts up to a maximum of $40 million. *See* Technical and

Miscellaneous Revenue Act of 1988 (TAMRA 1988), Pub.L. No. 100–647, § 5021, 102 Stat. 3342, 3666 (1988). The transactions here have been modified in a Closing Agreement with the IRS reached on June 16, 1992, to fall within the requirements of the grandfather clause and are, therefore, governed by § 60(b)(5) of DEFRA.

**10.** The operative facts are culled from the parties' Joint Stipulation, filed April 19, 1996, unless otherwise noted.

**11.** This sum was determined by a Closing Agreement reached with the IRS on or about June 16, 1992. Stip. ¶ 5.

**12.** Marigold was incorporated in Delaware on November 11, 1986.

of an affiliated group of which Doyon was the common parent. Accordingly, upon execution of the contractual agreement, Doyon acquired 100 shares of Marigold's Class A common stock, for $5,000.[13] Thereafter, Marriott assigned, based upon Doyon's estimate of its available losses and credit, $33,712,209 of its taxable income to Marigold. Pursuant to the foregoing contract, Doyon included the income assigned to Marigold on its consolidated return for the 1987 taxable year. The consolidation period between Doyon and Marigold ended on October 16, 1987, when Marriott exercised its option to repurchase the acquired 100 shares, from Doyon, for $6,000.

In exchange for allowing Marriott to utilize the accumulated losses and credits, Marriott, via Marigold, made certain payments to Doyon, as quid pro quo consideration. The contract provided that Marigold was to pay Doyon 36.8 cents for each dollar of deduction or loss available and 80 cents for each dollar of investment credit available. By December 30, 1986, Marigold had paid Doyon $11,313,600. "On July 28, 1988 Marigold paid Doyon an additional $1,092,493, for a total of $12,406,093." Stip. ¶ 11. Doyon, however, did not receive its payments outright. Rather, the contractual agreement required Doyon to contribute a portion of the payment to a grantor trust established as the form of escrow.[14]

## 2. Campbell Transaction

Doyon entered into a contractual agreement on July 14, 1987, with the Campbell Soup Company (Campbell) and CSC Alaska 1, Inc. (CSC), a subsidiary of Campbell.[15] Campbell, like Marriott, also sought to structure a contractual transaction that would enable it to offset some of its taxable income

with Doyon's losses and credits. To that end, it was agreed that CSC would become a member of Doyon's affiliated group. Consolidation was achieved between CSC and Doyon upon Doyon's purchase of CSC's voting preferred stock, a total of 2,000 shares, for $5,000, on July 14, 1987.[16] The consolidation period ended on October 31, 1987 when Doyon sold its CSC stock to a Campbell affiliate for $5,000.

Pursuant to the contract, the Campbell affiliated group assigned sufficient income to CSC, with the result that CSC recognized, as agreed to by the parties, $100 million in taxable income during the consolidation period of July 14, 1987 to October 31, 1987. The income assigned to CSC was included, of course, in Doyon's 1987 consolidated federal tax return. Additionally, the contractual agreement provided that Doyon would receive 39 cents for each dollar of net federal taxable income recognized by CSC, a total of $39 million. Full payment was conditioned upon the completion of the sale of certain asbestos properties by July 30, 1987.[17] As agreed, CSC immediately paid Doyon $100,000 upon the closing of said contract. Following the completion of the sale of the asbestos properties, CSC paid Doyon an additional $19,400,000. Finally, on October 15, 1987, pursuant to an escrow agreement between Doyon, CSC, and Campbell,[18] CSC paid the balance of the payment owed to Doyon, $19,500,000, into an escrow account established with Rainier National Bank.

### 3. Hilton Transactions

#### i. Hilton I Transaction

The Hilton Hotels Corporation (Hilton) also sought to take advantage of Doyon's

13. Marigold issued to Marriott: (i) 90,000 shares of its preferred stock, $1.00 par value, for $90,000; and (ii) 9,900 shares of its Class B Common Stock, $0.01 par value, for $495,000.

14. The "Grantor Trust Agreement" was entered into on December 30, 1986, among Riggs National Bank, as trustee, Marigold, Marriott, and Doyon.

15. CSC is a Delaware corporation formed on July 1, 1987.

16. Campbell acquired all of CSC's authorized Class A common stock.

17. Specifically, the agreement referred to the completion of the "Mine Sale." Stip. ¶ 16.

18. Campbell, CSC, Doyon, and Rainier National Bank executed an escrow agreement on September 4, 1987.

unclaimed losses and credits to shelter some of its income from tax liability. To obtain the benefit of Doyon's NOLs and ITCs, Hilton and its newly-formed subsidiary, HIL–A VII Corp. (Corp. VII), entered into a contract with Doyon on December 18, 1987.[19] It was agreed that Corp. VII would become an affiliated member of Doyon's group. Consequently, to effectuate consolidation, Doyon purchased 100 shares of Corp. VII's Class A common stock, for $100, upon execution of the foregoing contractual agreement. The consolidation period ended shortly thereafter, on December 31, 1987, when Hilton exercised its option and repurchased the Corp. VII stock from Doyon for $101.

Just prior to this contract, Hilton capitalized Corp. VII with $1,000 and a Hilton promissory note in the "principal amount of $9,453,509,454, bearing interest at 12% per annum." Stip. ¶ 21. Corp. VII transferred this note to a Limited Partnership,[20] as its capital contribution in exchange for a limited partnership interest. Pursuant to the partnership agreement, limited partners like Corp. VII were allocated 99% of the partnership's income. Under this structure, Corp. VII accrued $40 million in gross income during its consolidation period with Doyon, i.e., December 18, 1987 through December 31, 1987. To receive the full benefit of Doyon's losses and credits, the income Corp. VII accrued was included in Doyon's consolidated federal tax return for its TYE 1988.

Furthermore, the contract between Hilton, Corp. VII, and Doyon set forth the method and amount of payment Doyon would receive in exchange for making available its losses and credits to Hilton. Specifically, Corp. VII was required "to pay Doyon 35% of each dollar of taxable income transferred to Corp. VII, or a total of $14 million." Stip. ¶ 23.

Pursuant to these provisions, Doyon received, by wire transfer, $8,400,000 on December 18, 1987. Corp. VII paid the balance, $5,600,000, with a promissory note guaranteed by Hilton. "Payment of all accrued and unpaid principal and interest on the promissory note was due upon the closing for federal income tax audit and assessment purposes of Doyon's taxable year ending October 31, 1988." Stip. ¶ 24.

### ii. Hilton II Transaction

Hilton and Doyon structured a second contractual transaction to further enable Hilton to utilize Doyon's losses and credits (Hilton II Transaction). Hilton, as in its first transaction, created another special subsidiary to take part in this transaction, HIL–A Corp. I (Corp. I).[21] Thereafter, Hilton and Corp. I entered into a contract with Doyon, on April 29, 1988. Under the terms of this contractual agreement, Corp. I became a member of Doyon's affiliated group. Consolidation was achieved on April 29, 1988, when Doyon purchased 100 shares of Corp. I for $100. At the close of business on June 15, 1988, Hilton repurchased the stock of Corp. I from Doyon for $101, thereby terminating the consolidation period.

Hilton capitalized its specially created subsidiary, Corp. I, with a $1,000 capital contribution and a promissory note in the principal amount of $45,000,000. Corp. I transferred this promissory note to a Limited Partnership,[22] in exchange for a limited partnership interest. Limited partners, according to the partnership agreement, were allocated 99% of the limited partnership's income. Further, Hilton agreed to directly assign $45,-454,455 of its taxable income to Corp. I. The net effect of these transactions was that Corp. I accrued $40 million [23] in gross income

---

**19.** Hilton Inns, a wholly-owned subsidiary of Hilton, and the Fifth Transaction L.P. were also parties to this agreement.

**20.** The Limited Partnership, named the Fifth Transaction L.P., was formed on December 10, 1987, partly to facilitate tax-sharing transactions with ANCs. Hilton Inns, Inc. was the general partner of the Fifth Transaction.

**21.** Corp. I was incorporated on April 29, 1988, as a wholly-owned subsidiary of Hilton, pursuant to the laws of Nevada.

**22.** Seventh L.P. is the name of the limited partnership involved in Hilton Transaction II. It was formed on April 29, 1988. The general partner of the Seventh L.P. was Hilton Inns, Inc., a wholly-owned subsidiary of Hilton.

**23.** This amount also reflects the adjustment agreed to in the Closing Agreement, in order to comply with the limitations imposed by § 5021(b)(2) of TAMRA of 1988.

during its period of consolidation with Doyon. As agreed, this income was reported on Doyon's consolidated federal tax return for its TYE 1988.

The payment provisions of the agreement stated that Doyon was entitled to 28% of each dollar of taxable income transferred to Corp. I, or a total of $11.2 million. Unlike the previous transaction, Corp. I issued a promissory note guaranteed by Hilton for the entire sum owed to Doyon. Under the terms of the promissory note, payment was conditioned upon reaching a final determination of Doyon's tax liability with respect to its TYE 1988.

## C. Filing Consolidated Tax Return for TYE 1987 and 1988

In July 1988, pursuant to an extension of time granted by the defendant, Doyon and its affiliates, which included both CSC and Marigold, filed a consolidated tax return for the tax year ending October 31, 1987. Doyon's loss from the disposition of a mineral property in that year exceeded the group's total consolidated net income, including the income assigned to the specially created subsidiaries, Marigold and CSC. Consequently, "Doyon and its affiliates incurred no income tax liability for this year." Ex. 9 at 749, 767.

Also, in July of 1989, Doyon and its affiliated companies, pursuant to an extension of time granted by the defendant, filed a consolidated federal income tax return for the tax year ending October 31, 1988. Doyon and its affiliates, including Corp. VII and Corp. I, did not incur any regular tax liability for TYE October 31, 1988 "because Doyon's net operating loss carryover from the fiscal year ended October 31, 1987 exceeded the group's consolidated taxable income (before taking the net operating loss deduction into account)." Ex. 9 at 749, 767.

Doyon reported an AMT liability of $1,858,473 and an environmental tax liability of $109,108 on its consolidated federal income tax return for fiscal year ended October 31, 1988, and timely paid such taxes.

## D. Closing Agreement and Payments Due Doyon

In connection with an audit of Doyon's consolidated federal income tax returns for the fiscal years ended October 31, 1987, 1988, 1989, and 1990, the IRS examined the four transactions discussed above. On or about June 16, 1992, Doyon and the Commissioner entered into a final agreement entitled "Closing Agreement on Final Determination Covering Specific Matters" (Closing Agreement). The Closing Agreement settled specific issues regarding Doyon's tax obligations for the taxable years ending 1987 and 1988. More specifically, it was agreed that, subject to a claim for refund, for the TYE 1988 Doyon's AMT liability was $2,476,201, and its environmental tax liability was $146,260. Doyon paid the excess of the agreed amount of AMT and environmental tax for TYE 1988 over the amount of such taxes shown on its return.

After execution of this Closing Agreement, "Marriott, Campbell, and Hilton caused the amounts then due under the ... agreements and associated notes and escrow arrangements to be transferred to Doyon's account." Stip. ¶ 32 (emphasis added).

## E. Filing for Tax Refund

On August 28, 1993, "Doyon and its affiliated companies filed an amended consolidated tax return for the TYE 1988." Stip. ¶ 39. Doyon asserted in its claim for refund that the amount of tax agreed to with respect to the AMT and environmental tax liabilities was erroneously calculated, and that $746,942 should be refunded. Doyon's "consolidated book income for the fiscal year ended October 31, 1988, before taxes and extraordinary items, as published in [Doyon's] annual report was $79,723,568." Ex. 9 at 751. "In calculating the AMT and environmental tax set forth in the Closing Agreement, the [IRS] increased Doyon's book income to $159,259,108—an increase of $79,535,540." Ex. 9 at 751. Doyon claims that the Service erred in not *decreasing* its adjusted net book income by $70,506,093, (*i.e.*, the Disputed Sum). The Disputed Sum represents the amount of financial income realized by Doyon during the taxable year from its tax-sharing

contractual agreements: (i) $39,000,000 from the Campbell transaction; (ii) $25,200,000 on account of the Hilton transaction; (iii) $1,356,093 pursuant to the Marriott transaction; and (iv) $4,950,000 represents an adjustment to book income to reverse the effects of a prior year's federal tax accruals.

Doyon waived its right on December 23, 1992, to a statutory notice of partial disallowance of its claim for refund of 1988 taxes.

## CONTENTIONS OF THE PARTIES

### A. *Plaintiff*

Doyon was the initial party to move for partial summary judgment. In its motion filed May 7, 1996, plaintiff maintains that the Disputed Sum must be excluded, *i.e.*, subtracted, from its ANBI, for purposes of calculating its AMT and environmental tax liability. Doyon points to I.R.C. § 56(f)(2)(B) and Treas.Reg. § 1.56–1(d)(3)(i), which provide that ANBI must be "adjusted to disregard ... any Federal income taxes." Accordingly, Doyon contends that the Disputed Sum constitutes "federal income taxes" within the meaning of the relevant code and regulatory provisions. More specifically, Doyon alleges that "federal income taxes" contemplates both items of tax expense and items of tax benefit. Doyon then avers that in both substance [24] and form, for reasons that will be explicated *infra*, the Disputed Sum is an item of tax benefit. Thus, concludes plaintiff, because the Disputed Sum is an item of tax benefit and, therefore, an item of "federal income tax," such amount cannot be taken into consideration when determining its 1988 ANBI.

In addition, plaintiff charges that Congress specifically forbade the Commissioner, by its enactment of § 1804(e)(4) of the Tax Reform Act of 1986, from applying any provision of the Code or principle of law to deny an ANC the "full benefit" of its tax NOLs and ITCs. Therefore, avers plaintiff, to prevent it from eliminating the Disputed Sum from its ANBI would deny it the full benefit of its tax credits and losses in violation of § 1804(e)(4).

Lastly, plaintiff asserts that any ambiguity raised as to the application of § 1804(e)(4) should be resolved in light of the rule of construction which states—statutes containing language that can be reasonably interpreted to confer a tax exemption to Native peoples should be construed in their favor. Plaintiff argues that, because § 1804(e)(4) was enacted to help ANCs, it should, therefore, be construed liberally "to protect Doyon's full use and benefit of its losses and credits." [25] For these reasons, concludes Doyon, it is entitled to summary judgment as a matter of law.

### B. *Defendant*

In response, the United States counters that the Disputed Sum at issue here does not constitute "federal income taxes" within the contemplation of I.R.C. § 56(f)(2)(B) or the applicable regulations. Defendant avers that an item of federal income tax—be it an item of tax expense or tax benefit—must arise under the exercise of the sovereign's taxing authority. Further, charges defendant, amounts paid between private parties pursuant to private contracts are not and cannot be "federal income taxes." Here, defendant argues, the facts indisputably establish that plaintiff received the Disputed Sum pursuant to the terms of its *private* contractual agreements. Therefore, concludes defendant, the Disputed Sum does not, in either substance or form, constitute an item of federal income tax.

---

24. To further support its position that the Disputed Sum represents, in substance, an item of federal tax benefit, plaintiff initially cited to the generally accepted accounting principles (GAAP). Defendant, in response to plaintiff's reliance on GAAP, asserted that financial accounting principles were irrelevant to the proper interpretation of the applicable Code provisions and regulations. Defendant further asserted that to the extent that this court found that accounting principles were indeed material, then there is a genuine issue of material fact with respect to plaintiff's motion. However, in their subsequent briefs, both Doyon and the Government concurred that the accounting principles were not relevant to the issue at bar, and that no genuine issue of material fact existed as to either parties' motion. We agree.

25. Plaintiff's Opposition to Defendant's Cross–Motion for Partial Summary Judgment and Reply, filed July 8, 1996 (Pl. Reply Br.), at 16.

In addition, defendant alleges that plaintiff's reliance on § 1804(e)(4) is misplaced, because here at bar the Commissioner has not applied any principle of law, nor provision of the Code, to deny plaintiff the *use* of its losses and credits. The Commissioner, defendant maintains, has simply refused to apply a provision of the Code, where the requirements for use of that provision have not been met. Therefore, asserts defendant, plaintiff cannot invoke § 1804(e)(4) "as grounds for excluding the Disputed Sum from ANBI where the Code simply does not allow such an exclusion."[26] Finally, defendant contends that the rule of construction to which plaintiff cites is inapplicable here because neither the relevant code provisions nor its parallel Treasury regulations are ambiguous.[27] For the foregoing reasons, defendant opposes the entry of partial summary judgment on behalf of plaintiff and seeks the same on the Government's behalf.

## DISCUSSION

### A. Summary Judgment Standards

Summary judgment is appropriate when there is no dispute over any genuine issue of material fact and the movant is entitled to judgment as a matter of law. RCFC 56. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). When considering a motion for summary judgment, the court must view the evidence and all factual inferences in the light most favorable to the non-moving party. *Litton Indus. Prod., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985). The moving party bears the initial burden of showing that there are no

genuine issues of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The movant may discharge its burden by "pointing out ... that there is an absence of evidence to support the non-moving party's case." *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1563 (Fed.Cir.1987). If the movant succeeds in satisfying its burden, the non-movant must then demonstrate, by appropriate evidence, the existence of a genuine issue of material fact. *Beauchamp Constr. Co. Inc. v. United States*, 14 Cl.Ct. 430, 435 (1988). With the following considerations firmly in mind, we turn to the parties' cross-motions for partial summary judgment.

The first step in considering a motion for summary judgment is to ascertain whether any genuine issues as to a material fact are present. To evaluate whether a factual dispute is material, one must look to the legal standards applicable to the subject of the suit. Only legally significant facts, *i.e.*, those that would change the outcome of the litigation, are deemed material. If it is determined that no genuine issues of material fact are in dispute, the court is then in a position to decide whether the moving party is entitled to judgment as a matter of law. Because we can find no genuine issues of material fact on this record, we conclude that, based on the legal standards applicable to the subject at issue, defendant is entitled to judgment as a matter of law.

### B. Analysis

#### 1. The Alternative Minimum Tax

The issue to be decided on the cross-motions at bar turns on the proper interpretation and application of certain I.R.C. and regulatory provisions governing the calculation of the AMT.[28] The AMT "is, in effect, a

---

**26.** Defendant's Cross–Motion for Partial Summary Judgment, filed June 6, 1996 (Def.Br.), at 16.

**27.** In plaintiff's initial brief, it was unclear whether it sought to apply this rule of construction to the AMT provisions or § 1804(e)(4). However, plaintiff clarified its position in its reply brief by stating: "[S]ection 1804(e)(4) of the 1986 Act is a statute intended to benefit native peoples, and the Court should apply it liberally to

protect Doyon's full use of its losses and credits." Pl. Reply Br. at 16.

**28.** The environmental tax is relevant here only because its calculation is pegged to alternative minimum taxable income (AMTI), with certain adjustments set forth in § 59A(b) of the I.R.C. AMTI, in turn, is determined in part by a corporation's adjusted net book income (ANBI). Thus, if Doyon's ANBI includes the proceeds from the private sale of its NOLs and ITCs, it will incur *greater* environmental tax liability.

true alternative tax, in the sense that it is computed by applying an alternative rate to an alternative income base...." *Chugach,* 34 F.3d at 1466 n. 6 (quoting *General Explanation of the Tax Reform Act of 1986,* 99th Cong., 2d Sess., 437 (1987)). If the alternative calculation exceeds the regular tax for the taxable year, the excess amount is the AMT. *Id.* A corporation must pay the AMT in addition to its regular tax liability. I.R.C. § 55(a).

Congress first enacted the minimum tax provisions in 1969 to insure that high-income taxpayers could not studiously avoid significant tax liability by utilizing the various tax preferences typically available to them.[29] Consequently, these provisions were designed to exclude from consideration certain tax preferences available to taxpayers when computing their regular tax. Stated differently, the tax base used in determining the AMT is broader than the regular taxable income base and is intended to provide a better measure of a taxpayer's economic income. This in turn would make sure that "those receiving [certain tax] preferences also pa[id] a share of the tax burden." S.Rep. 552, 91st Cong., 1st Sess., 112 (1969–3 C.B. 423, 495), reprinted in 1969 U.S.C.C.A.N. 2143.

In 1986, the minimum tax provisions were modified to better achieve their original purpose. Congress determined that the relevant provisions under prior law were inadequate, essentially because they did not sufficiently measure a taxpayer's economic income. *See General Explanation of the Tax Reform Act of 1986,* 99th Cong., 2d Sess., 433 (1987). Specifically, with respect to corporations, Congress found that "both

the perception and the reality of fairness ha[d] been harmed by instances in which corporations paid little or no tax in years when they reported substantial earnings, and may even have paid substantial dividends, to shareholders." *Id.*; *see* H.R.Rep. No. 426, 99th Cong., 1st Sess., 306 (1985). Congress believed that "to achieve both real and apparent fairness, ... there must be a reasonable certainty that, whenever a company publicly reports significant earnings, that company will pay some tax for the year." *General Explanation of the Tax Reform Act of 1986,* 99th Cong., 2d Sess., 434 (1987). Therefore, to address concerns that companies with substantial income for financial accounting purposes might still pay de minimis taxes, Congress determined that the AMT, for tax years beginning in 1987–1989, would be based, in part, on the corporation's "book income" [30] reflected in applicable financial statements, typically used for non-tax purposes, such as soliciting investors. *Id.* at 434.

Doyon concedes that ANCs are subject to the AMT provisions. At issue here is the proper calculation of the AMT, specifically, the appropriate determination of Doyon's adjusted net book income (ANBI). A corporation's AMT is equal to 20% of the alternative minimum taxable income (AMTI). I.R.C. § 55. AMTI, in turn, is taxable income adjusted by §§ 56 and 58 of the Code, and increased by tax preferences set forth in § 57. I.R.C. § 55(b)(2). Further, pursuant to I.R.C. § 56, a corporate taxpayer's AMTI is increased by 50% of the excess of ANBI over AMTI.[31] I.R.C. § 56(f). Lastly, ANBI is defined as the "net income or loss of the taxpayer set forth on the taxpayer's applica-

---

Only corporations are subject to environmental tax liability. I.R.C. § 59A(a). The tax is set at an annual rate of $12 for every $10,000 of AMTI, with certain modifications. I.R.C. § 59A(a). The first $2,000,000 of a corporation's income earned during a tax year is exempt from tax. I.R.C. § 59A(a)(2). Also, the tax is imposed whether or not the corporation is subject to AMT liability.

The revenue generated by the imposition of the environmental tax is earmarked for the Superfund, a trust fund established by the Government to assist in the clean up and protection of the environment from contamination. *Statement by President Ronald Reagan upon Signing H.R. 2005,* 22 Weekly Comp.Pres.Doc. 1412 (Oct. 27, 1986).

29. *See* H.R.Rep. No. 413, 91st Cong., 1st Sess., 78 (1969), reprinted in 1969 U.S.C.C.A.N. 1645, 1725 ("The objective of this provision ... is to insure that the minority of high-income individuals who pay little or no tax under present law will generally no longer be able to do this.").

30. For taxable years beginning after 1989, the "net book income" preference is replaced by a corporation's adjusted current earnings. I.R.C. § 56(g).

31. Therefore: AMTI = AMTI + 50% (ANBI– AMTI).

ble financial statement adjusted as provided in [I.R.C. § 56]." I.R.C. § 56(f)(2)(A). Thus, the larger a corporate taxpayer's ANBI, the greater AMT liability it will likely incur.

To arrive at ANBI, I.R.C. § 56(f)(2)(B) and Treas.Reg. § 1.56–1(d)(3)(i) require certain adjustments for taxes. Section 56(f)(2)(B) provides that ANBI "shall be appropriately adjusted to disregard any Federal income taxes, ... which are directly or indirectly taken into account on the taxpayer's applicable financial statement." Its parallel Treas.Reg. § 1.56–1(d)(3)(i) further stipulates that ANBI "must be adjusted to disregard (for example, by adding back) any Federal income taxes ... that are directly or indirectly taken into account on the taxpayer's applicable financial statement." Doyon contends that the Disputed Sum is "federal income taxes" within the meaning of I.R.C. § 56(f)(2)(B) and Treas.Reg. § 1.56–1(d)(3)(i). More specifically, plaintiff argues that "federal income taxes" as used in I.R.C. § 56(f)(2)(B) contemplates items of tax benefit, in addition to items of tax expense. Here, argues Doyon, the Disputed Sum is an item of tax benefit, for the reasons discussed *infra*, and, consequently, such amount must be excluded as "federal income taxes" from its ANBI, thereby reducing its AMT liability.

### i. Interpreting the Code and Its Applicable Regulations:

■ To prevail on its motion, plaintiff must prove by a preponderance of the evidence[32] that the Disputed Sum is "federal income taxes" within the meaning of I.R.C. § 56(f)(2)(B). Because Doyon admits that the Disputed Sum is not an item of federal tax expense, the foundation of its position rests on its assertion that items of tax benefit come within the meaning of "federal income taxes." To support its interpretation of the relevant statute, Doyon relies principally on legislative history.[33]

■ We, however, are continuously mindful of the rule of statutory construction, which instructs us that "legislative history ... may be referred to only in instances whe[re] the statutory terms are ambiguous and the intent unclear." *Snap–On Tools Inc. v. United States*, 26 Cl.Ct. 1045, 1070 (1992), *aff'd*, 26 F.3d 137 (Fed.Cir.1994).[34] This court's role is "to interpret the laws, as evidenced by the statutory language, rather than to reconstruct legislative intentions," and unless otherwise specifically defined, "words will be interpreted as taking their ordinary, contemporary, and common meaning." *Snap–On Tools Inc.*, 26 Cl.Ct. at 1057; *see also Mulholland v. United States*, 28 Fed.Cl. 320, 332 (1993), *aff'd*, 22 F.3d 1105 (Fed.Cir.1994). Accordingly, "where the language is clear, the courts should not replace that language with unenacted legislative intent, [citations omitted] and when a statute evidently was drawn with care, and its language is plain and unambiguous, a court cannot supply omissions...." *Snap–On*

---

**32.** *See Tucker v. United States*, 8 Cl.Ct. 180, 186 (1985).

**33.** The following are excerpts of the relevant legislative history cited by Doyon:

"It is clarified that no item of Federal or foreign income tax expense or benefit ... is included in the computation of adjusted pre-tax book income for minimum tax purposes." H.R.Conf.Rep. No. 841, 99th Cong., 2d Sess., II–273, *reprinted in* 1986 U.S.C.C.A.N. 4075, 4361.

"The book income preference is a measurement of the amount by which pre-tax financial statement income of the taxpayer exceeds its unadjusted alternative minimum taxable income. Thus, *it is necessary to remove items of* financial statement income and expense that relate to federal or foreign income taxes. This

includes both items of tax provision that are separately stated and any items of tax expense or benefit that may be included in other items of income or expense." Staff of the Joint Committee on Taxation, *General Explanation of the Tax Reform Act of 1986*, 99th Cong., 2d Sess., 454 (1987).

"Extraordinary items are included in adjusted net book income, unless they are items of tax benefit or expense, such as the use of a foreign tax or net operating loss carryforward." *Id.* at 455.

**34.** *See Burlington Northern R.R. v. Oklahoma Comm'n*, 481 U.S. 454, 461, 107 S.Ct. 1855, 1859, 95 L.E.2d 404 (1987), where the Supreme Court stated: "Unless exceptional circumstances dictate otherwise, when we find the terms of a statute unambiguous, judicial inquiry is complete."

*Tools,* 26 Cl.Ct. at 1057; *see also International Paper Co. v. United States,* 33 Fed.Cl. 384, 390 (1995) (citing *Deputy v. du Pont,* 308 U.S. 488, 498, 60 S.Ct. 363, 368, 84 L.Ed. 416 (1940)).

Here, "federal income taxes" as used in the relevant Code provision and applicable regulation is, of course, the operative language at issue. While it is true, as defendant avers, that neither the Code nor the regulations specifically define "federal income taxes," we find that, upon close examination of the relevant regulations, these statutory terms are unambiguous. We construe the term "federal income taxes," therefore, in accordance with its plain and ordinary meaning.

Throughout the relevant regulations the term "income tax expense" is employed when referring to Treas.Reg. § 1.56–1(d)(3)(i). However, there is absolutely no indication in either the statute or applicable regulations that items of "tax benefits" are "federal income taxes" for purposes of I.R.C. § 56(f)(2)(B). For instance, the language in Treas.Reg. § 1.56–1(d)(3)(i) itself states:

> No adjustment is made for taxes not described in the preceding sentence. Taxes directly or indirectly taken into account *consist* of the taxpayer's total *income tax expense* that includes current and deferred *income tax expense.*

I.R.C. § 1.56–1(d)(3)(i) (emphasis added). Moreover, Treas.Reg. § 1.56–1(d)(3)(iii), which describes certain valuation adjustments, employs the phrase "income tax expense" when referring to § 1.56–1(d)(3)(i). Specifically, Treas.Reg. § 1.56–1(d)(3)(iii) provides, in relevant part, that *"[i]ncome tax expense* under (d)(3)(i) of this section does not include valuation adjustments ... related to purchase accounting...." I.R.C. § 1.56–1(d)(3)(iii) (emphasis added). Furthermore, Treas.Reg. § 1.56–1(d)(3)(iv) sets forth six fact patterns explaining how to properly compute ANBI. All six examples discuss how items of income tax expense are taken into consideration when calculating ANBI. Items of tax benefit and their possible impact on ANBI are not discussed at all. Thus, it is clear beyond cavil that items of federal income tax expense come within the meaning

of "federal income taxes," as used in I.R.C. § 56(f)(2)(B).

█ It is also significant that the plain meaning we give to "federal income taxes" is one that contemplates items of income tax expense, and not items of tax benefit. "A tax, in the general understanding of the term, ... signifies an exaction for the support of the Government," *United States v. Butler,* 297 U.S. 1, 61, 56 S.Ct. 312, 317, 80 L.Ed. 477 (1936), and has been held to be the "enforced proportional contribution of persons and property, levied by the authority of the State for the support of the Government, and for all public needs." *Bank of Mount Hope v. Commissioner,* 25 B.T.A. 542, 543 (1932) (quoting *Florida Central & Peninsular R.R. Co. v. Reynolds,* 183 U.S. 471, 475, 22 S.Ct. 176, 178, 46 L.Ed. 283 (1902)). In addition, a tax is "neither a penalty imposed on the taxpayer nor a liability which he assumes by a contract." *Welch v. Henry,* 305 U.S. 134, 146, 59 S.Ct. 121, 125, 83 L.Ed. 87, *reh'g denied,* 305 U.S. 675, 59 S.Ct. 250, 83 L.Ed. 437 (1938); *Webb v. United States,* 66 F.3d 691, 697 (4th Cir.1995). Therefore, the plain, rational, and obvious meaning of "federal income taxes" is that they represent an exaction by the Government for the purpose of raising revenue, *i.e.,* an income tax expense.

Having determined that there is no ambiguity and that the plain meaning of federal income taxes should control, we do not need to look to the legislative history cited to by the plaintiff. *See Snap-On Tools,* 26 Cl.Ct. at 1070. In light of our construction of "federal income taxes," *supra,* we further find that the Disputed Sum clearly does not represent an exaction by the Government. Rather, the Disputed Sum, was simply received as consideration from private parties, *i.e.,* Marriott, Campbell, and Hilton, pursuant to a private contract, and unquestionably does not reflect any payment made to or imposed by the Government. Accordingly, we hold that the Disputed Sum is not an item of "federal income tax" within the contemplation of I.R.C. § 56(f)(2)(B), and should not be eliminated from Doyon's ANBI.

### ii. Assuming "Federal Income Taxes" Contemplates Items of Federal Tax Benefit:

■ Our ultimate conclusion does not change *even if* we assume that items of federal tax benefit are "federal income taxes" for purposes of I.R.C. § 56(f)(2)(B). Assuming *arguendo*, therefore, that pursuant to § 56(f)(2)(B) of I.R.C., items of federal tax benefit must not be taken into consideration when determining a taxpayer's ANBI, the critical issue then becomes whether the Disputed Sum is in fact an item of tax benefit, as plaintiff alleges. Accordingly, the proper questions before us now become: (i) what is an item of federal tax benefit, and (ii) does the Disputed Sum come within that definition. Cognizant of the principle that provisions granting exemptions and deductions from tax are strictly construed,[35] we turn to address the first question.

A taxpayer receives a federal tax benefit from a deduction or credit when they are "fully effective to offset taxable income." *Magale v. United States*, 118 Ct.Cl. 183, 93 F.Supp. 1004, 1008 (1950). *Prewitt v. Commissioner*, 69 T.C.M. (CCH) 1693, 1696, 1995 WL 16530 (1995). Put differently, a taxpayer's losses or credits "have no value in and of themselves; the economic benefit to the [taxpayer]—the 'true tax benefit'—arises because the [taxpayer] may offset tax deductions against income received from other sources or use tax credits to reduce the taxes otherwise payable on account of such income." *Randall v. Loftsgaarden*, 478 U.S. 647, 656, 106 S.Ct. 3143, 3149, 92 L.Ed.2d 525 (1986). An item of federal tax benefit is not merely, as plaintiff would have us believe, an "accounting adjustment designed to reflect the effect of tax items of book earnings."[36] Furthermore, in keeping with the principle that provisions granting deductions and exemptions from tax should be strictly construed, we note that "federal" as that word is used in the Code, regulations, and legislative history cited to by the plaintiff, suggests that

an item of federal tax benefit must arise in connection with government action. Consequently, we agree with the defendant and find that an item of federal tax benefit is an abatement of liability under the revenue laws. We further recognize that an item of federal tax benefit may take the form of a tax rebate or refund from the Federal Government. Accordingly, Doyon's losses and credits may give rise to a tax benefit if they effectively offset its taxable income or results in the *plaintiff* receiving a tax refund from the Government.

Next, we must determine whether the Disputed Sum is an item of federal tax benefit as we have defined it: an abatement of tax liability under the revenue laws, or a tax rebate or refund from the Federal Government. According to the facts herein, Doyon had a significant amount of losses and credits. Instead of choosing to solely offset its own income, Doyon decided to enter into, as it notes in it 1988 financial statement, *NOL sales* transactions. Pursuant to its sales contracts, specially created subsidiaries of Marriott, Campbell, and Hilton became temporary members of an affiliated group of which Doyon was the common parent. Marriott, Campbell, and Hilton then assigned certain amounts of their income to their subsidiaries. This income was subsequently sheltered, *i.e.*, effectively offset, on Doyon's 1987 and 1988 consolidated tax returns. Accordingly, it is clear that Doyon and its affiliates received a tax benefit upon filing the consolidated tax returns. Moreover, in exchange for sheltering their income, Marriott, Campbell, and Hilton paid Doyon the Disputed Sum, via the specially created subsidiaries and various escrow arrangements.

Against this factual background, Doyon contends, in sum, that the Disputed Sum it reported on its financial statement is a federal tax benefit item, and, therefore, "federal income taxes" under I.R.C. § 56(f)(2)(B), because: (i) the economic substance of the

---

**35.** *See C.I.R. v. Jacobson*, 336 U.S. 28, 49, 69 S.Ct. 358, 369, 93 L.Ed. 477 (1948). We recognize that, while I.R.C. § 56(f)(2)(B) does not grant an exemption or deduction to a taxpayer's regular tax liability, it does provide for certain adjustments to the relevant taxable base, *i.e.*, AMTI, used to compute AMT liability. Accord-

ingly, we find this rule of construction equally applicable here and will construe § 56(f)(2)(B) strictly.

**36.** Pl. Reply Br. at 4.

transaction should control; (ii) the ultimate source of the funds was the Federal Treasury; (iii) the form of the transaction is analogous to an intercompany payment of federal tax expense; and (iv) to convert the Disputed Sum into anything but an item of federal tax benefit is "contrary to the principle that a payment that anticipates future income has the same character as the future income would have had when collected."[37]

We disagree with each of these contentions. We begin by noting that the economic substance of the transaction alone is not determinative of its tax consequences. Rather, it is well established that "a transaction is to be given its effect in accord with what actually occurred and not in accord with what might have occurred." *Commissioner v. National Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 148, 94 S.Ct. 2129, 2137, 40 L.Ed.2d 717 (1974). Thus, while a "taxpayer is free to organize his affairs, nevertheless, having done so he must accept the tax consequences of his choices whether contemplated or not, and may not enjoy the benefit of some other route he might have chosen to follow but did not." *Id.* at 149, 94 S.Ct. at 2137 (citations omitted).

In the instant case, Doyon chose not to offset *its own income with its NOLs and ITCs*. If Doyon had chosen to carryback its losses to offset its own income, and had received a subsequent tax refund from the Government, there is little doubt the amount of the refund would have reflected an item of federal tax benefit. Examining the tax consequences of an alternative route Doyon could have taken, however, does not shed light on the matter before us. We must examine Doyon's chosen transaction. Here, Doyon chose to turn to the private sector to sell its losses and credits. Contrary to what plaintiff would have us believe, this transaction was not just about tax benefits. From

Doyon's posture it decided to sell a tax resource, *i.e.*, its NOLs and ITCs, that would probably have long expired before Doyon could realize the taxable income against which it could have sheltered such deductions and credits. Thus, we believe that it is critically significant to note that this infusion of capital, the Disputed Sum, came from the private, and *not* from the federal, sector.

Moreover, while plaintiff avers that the Treasury was the "ultimate source" of the Disputed Sum, it is indisputable that, pursuant to the provisions of the contractual agreements chosen, Marriott, Campbell, and Hilton were the *immediate, actual, and sole* sources of the Disputed Sum. The fact that Congress authorized such transactions, *i.e.*, permitting Doyon to turn to the private sector to accelerate the monetization of its NOLs and ITCs, does not influence our ultimate conclusion that the Disputed Sum merely reflects proceeds from the private sale of a property right. The plaintiff also argues that the "checks ... might as well have been written by the Treasury, because neither Marriott, Campbell, [n]or Hilton intended to pay anything except out of the proceeds of using Doyon's tax benefit."[38] We are of the view, however, that the amount of taxable income Doyon could shelter with its losses and credits was, simply, a factor, albeit the dominant factor, that Marriott, Campbell, and Hilton took into consideration when determining the compensation Doyon would receive. Simply because the anticipated tax savings determined the amount of the "checks," *i.e.*, quid pro quo consideration, does not change the fact that Doyon received its consideration from private parties, pursuant to a private contractual agreement.[39]

Additionally, we do not find plaintiff's assertion that the substance of the transaction does not change simply because the "tax benefits were exchanged to dollars"[40] persuasive. Plaintiff apparently contends that,

---

37. Pl. Reply Br. at 8.

38. Plaintiff's Motion for Partial Summary Judgment, filed May 7, 1996 (Pl.Br.) at 23.

39. In *Chugach*, the ANC sought to structure its NOLs so as to increase its regular tax liability, which would be reimbursed by the profitable corporation, and thereby reduce its AMT liability. The court, finding that "private agreements and payments to the Native Corporations were the *primary* benefit intended by § 60(b)(5)[,]" held that to require the ANC to incur AMT liability, as the IRS urged, would be inconsistent with the purpose of § 60(b)(5). *Id.* at 1469.

40. Pl. Reply Br. at 8.

while the Disputed Sum was paid to Doyon as contractual consideration, perhaps in anticipation of a federal tax benefit, it should, nevertheless, also be characterized as a federal tax benefit item. To support its assertion, plaintiff relies on *Hort v. Commissioner*, 313 U.S. 28, 30–31, 61 S.Ct. 757, 758, 85 L.Ed. 1168 (1940).[41] Again, we note that the substance of the transaction alone is not controlling; we must look to the actual transaction the taxpayer chose to achieve its goals. Furthermore, *Hort* is distinguishable from the instant case. In *Hort*, the Court held that a lump sum payment by a lessee to the taxpayer-lessor in exchange for the release from the duration of its lease agreement is properly characterized as a rental payment and, accordingly, is ordinary income to the taxpayer-lessor. Here, Doyon is not receiving a current payment in lieu of an anticipated benefit. Rather, it has chosen to enter into a transaction that would require it to presently use its losses and credits. Put differently, Doyon was required to realize a tax benefit, *i.e.*, use its NOLs and ITCs, as a condition precedent to receipt of the Disputed Sum. Thus, unlike the lessor, Doyon did not give up its anticipated benefit.

Moreover, Doyon makes much of the fact that a portion of the payments came directly from the specially created subsidiaries. Specifically, Doyon attempts to analogize the payments with intercompany payments by affiliates of their allocated tax expense. The transaction chosen, however, is far more complicated then a simple intercompany payment. While it is true that the specially created subsidiaries were the conduits for the initial payments, it is also true that Marriott, Hilton, and Campbell, according to the joint stipulations, caused the remainder due Doyon to be transferred to its account. Consequently, there is a significant contribution to Doyon from non-affiliated members. Furthermore, we cannot conclude that an intercompany payment of an allocated tax expense is comparable to an intercompany payment for the benefit of using the parent's losses and credits pursuant to a private con-

tract. Thus, we find Doyon's analogy flawed.

Having addressed plaintiff's argument, we now summarize our findings. First, we find that the transaction chosen by Doyon determines its tax consequence, not merely the substance. *National Alfalfa*, 417 U.S. at 148–49, 94 S.Ct. at 2137. Consequently, hypothesizing as to what would have happened had Doyon chosen a different route does not influence our conclusion. Second, the facts establish that Doyon decided, instead of using its losses and credits to offset its *own* income alone, to sell them to private parties, in exchange for a quid pro quo consideration, *i.e.*, the Disputed Sum. Third, an item of "federal" tax benefit typically involves some action by the government. Here, however, contracts among private parties determined how much and under what conditions Doyon would receive this remuneration, *i.e.*, its consideration for utilizing its NOLs and ITCs to shelter the income of Marriott, Campbell, and Hilton. Finally, we also note that excluding the Disputed Sum runs afoul of the purpose behind the AMT provisions. The proceeds from the sale of Doyon's losses and credits constituted a significant portion of their record-high income and, in fact, enabled it to pay a dividend. Doyon's 1988 Annual Report states in relevant part:

> With a record $77.5 million in profits, this report reflects Doyon's *highest earnings in the history of Doyon*. The success of the past year has been the result of several developments. The most significant was the *sale* of net operating losses (NOLs), which enabled Doyon to recover a portion of its asbestos tax losses by selling them to other companies.... The NOL transactions required a great deal of corporate energy, including research, analysis, negotiation and lobbying. Our *success with the NOL sales* allowed the Board of Directors to declare a *special dividend.*

(emphasis added). This fact weighs heavily in favor of including the proceeds at issue in Doyon's ANBI for purposes of determining its AMT liability, because Congress sought to

---

**41.** Specifically, Doyon cites *Hort* as authority for the "fundamental tax principle that a payment that anticipates future income has the same char-

acter as the future income would have had when collected." Pl. Reply Br. at 8 (citation omitted).

ensure that high-income earners pay their fair share of the country's tax burden and the proceeds of sale are primarily responsible for Doyon's unusually high earnings for that year.

Thus, we hold that the Disputed Sum does not reflect an item of tax benefit. Rather, the Disputed Sum represents a private benefit received as consideration for utilizing its losses and credits to shelter the income of private, unrelated parties. Consequently, even assuming *arguendo* that "federal income taxes" as used in I.R.C. § 56(f)(2)(B), and the applicable regulations contemplates items of tax benefit, we nevertheless find that the plaintiff has not established that the Disputed Sum must be excluded from its ANBI.

### 2. Section 1804(e)(4) of the Tax Reform Act of 1986

█ Having concluded that the relevant I.R.C. and regulatory provisions do not require the Service to eliminate the Disputed Sum from ANBI, we turn to address whether, in the alternative, § 1804(e)(4) prohibits the Commissioner from taking the Disputed Sum into consideration when determining Doyon's AMT liability.

In 1986, Congress enacted § 1804(e)(4) as a clarifying amendment to § 60(b)(5) of DEFRA.[42] This amendment, set forth in § 60(b)(5)(B) of DEFRA, provided that, with certain exceptions not applicable here, until 1992:[43]

[N]o provision of the Internal Revenue Code of 1986 (including sections 269 and 482) or principle of law shall apply to deny the benefit or use of losses incurred or credits earned by [an ANC] to the affiliated group of which the [ANC] is a common parent.

Tax Reform Act of 1986, Pub.L. No. 99–514, § 1804(e)(4), 100 Stat. 2085, 2801 (1986). This is the critical language on which plaintiff relies to support its assertion that "even if the Service could identify [a Code provision that prohibits Doyon from eliminating the Disputed Sum from its ANBI], it would be forbidden by section 1804(e)(4) to use it."[44] More specifically, plaintiff contends that the Disputed Sum is its "benefit" from the use of its losses and credits, which the Service has denied, in part, by the "unwarranted inclusion"[45] of that "benefit" in its 1988 ANBI.

We find, however, that plaintiff's reliance on § 1804(e)(4) is misplaced, because it simply misconstrues the tax exemption granted to ANCs. We begin by emphasizing that § 1804(e)(4) was enacted to ensure that the original purpose of § 60(b)(5) was achieved.[46] Specifically, Congress passed this clarifying language to make certain that "the benefit of [ANC] losses and credits may not be denied in whole or in part by application of § 269, § 482, the assignment or income doctrine or any other provision of the [I.R.C.] or principle of law." H.R.Rep. No. 841, 99th Cong., 2d Sess., II–843, *reprinted in* 1986 U.S.C.C.A.N. 4075, 4931. Consequently, § 1804(e)(4) should be read in light of the objective sought by § 60(b)(5), and not in isolation.

As noted above, § 60(b)(5) of DEFRA granted ANCs an exemption from certain equity-requirements for affiliation, in order to enable them to sell their losses and credits. The exemption provided ANCs with greater bargaining power, thereby facilitating the receipt of significant capital in exchange for the "sale" of their NOLs and ITCs. Congress determined that the infusion of capital generated from these transactions would alleviate the financial distress plaguing many ANCs at that time. In light

---

**42.** *See Chugach,* 34 F.3d at 1464 ("The 1986 clarifying amendment strengthened § 60(b)(5) . . . by making it clear that the exemption . . . for affiliated groups headed by Native Corporations was to be taken literally.").

**43.** *See supra* note 9, explaining that Congress repealed the § 60(b)(5) exemption in 1988.

**44.** Pl. Br. at 26.

**45.** Pl. Reply Br. at 14 n. 8. Doyon urges this court to find an "ANBI interpretation that does not penalize Doyon for selling rather than using its tax benefits." *Id.*

**46.** *See* 132 Cong.Rec. S14,947 (June 23, 1986) (statement of Sen. Stevens) ("Our clarifying amendment . . . would increase the [ANCs'] share of the net tax benefits, thus furthering the policy decision made by Congress in 1984.").

of this Congressional intent, it appears that § 1804(e)(4) was enacted to instill upon the IRS that additional exemptions from the Code and other regulatory provisions that would normally preclude such tax affiliations were required. This in turn would assure that ANCs received the intended benefits from the sale of their losses and credits pursuant to § 60(b)(5), *i.e.*, the capital infusion.

The legislative history of § 1804(e)(4) itself further supports this interpretation. Senator Stevens of Alaska, when explaining § 1804(e)(4) stated, in part, that:

This broad based relief from unnecessary bureaucratic red tape will serve the social purpose concept I described in my floor statement. The term "principle of law" is to be interpreted broadly and is intended to avoid needless administrative delay, and the applicability of regulations not truly geared to the type of unique transfers contemplated in this amendment.... [I]t was my intention that statutes imposing filing and similar requirements that are meaningful for corporations truly participating in the competitive marketplace should not apply to NOL transactions. For example, the notification and warning period requirements, ... the Hart–Scott Rodino Antitrust Improvements Act of 1976, as amended, should not apply to transactions provided for under my amendment.

132 Cong. Rec. S13,932 (daily ed. Sept. 27, 1986) (statement of Sen. Stevens). Senator Stevens' objective was to make certain that the IRS recognized the special purpose of § 60(b)(5) and the transactions Congress sought to foster. Accordingly, it was intended that otherwise applicable administrative regulations should not apply to these NOL transactions, because subjecting ANCs to additional delay and transactional costs would diminish the "benefits" of these "unique transfers." However, there is no suggestion that once ANCs received the benefit, *i.e.*, the infusion of capital, the Service must exclude it from the taxable base taken into consideration when determining AMT liability. In other words, the legislative history makes clear that § 1804(e)(4) was enacted to ensure

that ANCs received a capital infusion from the sale of its losses and credits, but there is no indication that, having received that capital, further non-stipulated protection from provisions of the Code is warranted.

The extent of the exemption afforded by § 1804(e)(4) is better seen upon examination of the Commissioner's previous actions that led to the enactment of this clarifying amendment, in particular, its refusal to rule that I.R.C. §§ 269 and 482 did not apply to ANC-headed affiliated groups formed pursuant to § 60(b)(5). *Chugach*, 34 F.3d at 1464. Section 269 of the I.R.C. relates to the disallowance of deductions or credits following a tax-avoidance motivated acquisition. It is a given that profitable corporations, like Marriott, Campbell, and Hilton, sought to enter into § 60(b)(5) transactions to shelter some of their income from tax liability. Because these are tax-avoidance motivated transactions, the IRS, pursuant to I.R.C. § 269, could preclude an ANC from utilizing its losses and credits to shelter a profitable corporation's income, thereby eliminating the very incentive for these corporations to pursue § 60(b)(5) tax-affiliations. Consequently, applying § 269 would deprive ANCs an intended use and benefit of their losses and credits—the opportunity to sell their NOLs and ITCs to unrelated, private corporations.

Application of I.R.C. § 482 to these special tax-affiliations would also compromise the purpose of § 60(b)(5). Section 482 of the Code pertains to the IRS's authority to reallocate income, deductions, or credits among commonly controlled businesses. If I.R.C. § 482 applied to ANC-headed affiliations, it would generate a considerable amount of uncertainty, because the Service could reallocate the ANC's losses and credits in such a manner that would reduce the amount of income sheltered. Moreover, because the amount of income sheltered is largely determinative of the payment an ANC received under the contractual agreements, a reduction in tax-savings would, in turn, reduce an ANC's capital infusion, *i.e.*, its quid pro quo consideration. Furthermore, the uncertainty generated from the IRS's position would lessen the appeal of ANC tax-sharing transactions, thereby deterring profitable corpora-

tions from contracting with ANCs. Thus, because both I.R.C. §§ 269 and 482 would effectively prevent an ANC from enjoying the benefit and use of its losses and credits pursuant to § 60(b)(5), Congress passed the clarifying language of § 1804(e)(4) to specifically prohibit the IRS from applying these sections to ANC tax-sharing affiliations.[47]

Therefore, we find that Congress enacted § 1804(e)(4) to foster the unique transfers authorized by § 60(b)(5) of DEFRA, and their accompanying benefits. Accordingly, the Commissioner cannot apply provisions of the Code nor principles of law which: (i) preclude such tax-affiliations from taking place; (2) directly interfere with an ANC's ability to structure its contractual transactions to obtain the greatest benefit for the sale of its losses and credits; or (3) subject ANC-headed affiliations to administrative regulations which fail to recognize the special circumstances surrounding these transactions.

In this instance, the IRS did not deny Doyon the use or full benefit of its losses or credits. Refusing to exclude the Disputed Sum from an ANC's ANBI does not deprive ANCs of the opportunity to pursue § 60(b)(5) tax-affiliations. Here, Doyon sold its NOLs and ITCs to Marriott, Campbell, and Hilton without any interference by the IRS. Moreover, once the contract was formed, the IRS did not impede in any way upon Doyon's ability to structure and use its NOLs and ITCs in such a manner as to achieve the greatest bargain, i.e., quid pro quo consideration, from the sale of its losses and credits. Lastly, a determination that the Disputed Sum is not "federal income taxes" for purposes of § 56(f)(2)(B) does not subject Doyon to any type of "needless administrative delay" or additional transactional costs.

If we were to construe § 1804(e)(4) as broadly as plaintiff suggests, then ANCs would be able to use their losses and credits freely, without regard to *any* limitations imposed by the Code or its applicable regulations.[48] Given that § 1804(e)(4) is merely a clarifying amendment to § 60(b)(5) of DEFRA, we cannot agree with plaintiff's interpretation. Thus, we hold that the Commissioner's determination to include the Disputed Sum in Doyon's 1988 ANBI, for purposes of calculating its AMT and environmental tax liability, did not violate § 1804(e)(4).

### 3. Construing Ambiguous Statutes in Favor of Native Americans

Doyon also asserts that any ambiguity as to the application of § 1804(e)(4) to the case at bar should be resolved in its favor. Specifically, Doyon relies on a rule of construction instructing courts to liberally construe ambiguous statutes which can be "reasonably interpreted to confer a tax exemption to Native Americans" in their favor. *See Kirschling v. United States*, 746 F.2d 512, 515 (9th Cir.1984). We first note that, pursuant to the analysis above, we do not find § 1804(e)(4) ambiguous in the instant case. This conclusion alone would preclude the application of this rule of construction. Nevertheless, we further find that, assuming *arguendo* there is some ambiguity, § 1804(e)(4) cannot be "reasonably interpreted" to confer a tax exemption from the AMT provisions, because there is no clear expression of Congressional intent to provide such an exemption.

The Ninth Circuit in *Hoptowit v. CIR* stated that:

> [A]lthough ambiguous statutes ... are to be construed in favor of Indians, they are not to be construed to grant tax exemptions unless they contain language which

47. Additionally, the Ninth Circuit has addressed the applicability of § 1804(e)(4) to certain determinations of the IRS, in *Chugach*, 34 F.3d 1462. In that case, the Commissioner argued that § 60(b)(5) did not permit ANCs to offset income by losses incurred in a different year from when the income sought to be sheltered was earned. *Chugach*, 34 F.3d at 1467. The court, however, disagreed and found that the IRS's interpretation denied the ANC-headed affiliated group a benefit

of the ANC's losses, in violation of § 1804(e)(4). *Id.*

48. While we recognize that plaintiff here is not asking for an exemption from other provisions of the Code, we find, nonetheless, that it interprets § 1804(e)(4) much too broadly and not in accordance with the special purpose for which § 1804(e)(4) was enacted.

**28**

can reasonably be so construed. The *intent* to exempt from taxation must be *clearly expressed.*

709 F.2d 564, 565 (9th Cir.1983) (emphasis added); *see also United States v. Anderson,* 625 F.2d 910, 913 (9th Cir.1980), *cert. denied,* 450 U.S. 920, 101 S.Ct. 1367, 67 L.Ed.2d 347 (1981).[49] Consequently, while plaintiff argues that Congress may have thought it need not provide explicit language to exempt proceeds received in connection with § 60(b)(5) transactions, we must nonetheless find a "clearly expressed" intent to protect the benefit ANCs receive from the sale of their losses and credits from inclusion in the taxable base taken into consideration when computing AMT and environmental tax liability.

As discussed above, upon an examination of the legislative history before us, we find a clearly expressed intent to exempt ANCs from certain administrative and affiliation requirements, and other regulations that would diminish an ANC's ability to effectively realize the greatest bargain for its losses and credits. However, neither the legislative history nor the statutory language indicates that Congress sought to preclude the IRS from taking into consideration the revenue generated from § 60(b)(5) transactions, when calculating an ANC's AMT and environmental tax liability.

Because we find that § 1804(e)(4) is unambiguous in this instance and, further, that there is no clearly expressed intent to exclude proceeds received in connection with the sale of NOLs and ITCs from ANBI, we hold that the rule of construction which plaintiff urges us to follow is simply inapplicable.

## CONCLUSION

For the foregoing reasons, we find that there are no genuine issues of material fact

---

49. We also note that the court in *Chugach* applied the rule of construction, in light of the issues presented there, because § 1804(e)(4) *"definitely* expressed an intention to exempt Native Corporations from the normal affiliation rules." *Chugach,* 34 F.3d at 1467 n. 8 (emphasis added). Similarly, in *Kirschling,* the Ninth Circuit also cites this rule of construction in finding that certain transfers of land were not subject to the gift tax. 746 F.2d at 515. There, however, that relevant statute stated that "taxation" on the transfer of land would be lifted only upon the

regarding plaintiff's first cause of action and defendant is entitled to judgment as a matter of law. Therefore, defendant's cross-motion for partial summary judgment thereon is hereby GRANTED, and plaintiff's motion for partial summary judgment is DENIED. Pursuant to RCFC 54(b), as there is no just reason for delay, the Clerk shall enter judgment accordingly, dismissing plaintiff's first cause of action contained in its amended complaint.

Regarding plaintiff's second cause of action, the parties shall file, on or before January 24, 1997, any supplement(s) to their previously-filed Appendix G submissions, and a telephonic conference shall be held on February 3, 1997, at 2:00 p.m. EST (11:00 a.m. PST), to discuss the trial. The conference call will be placed to both parties by the court.

IT IS SO ORDERED.

deliverance of title in fee simple. Thus, "taxation" as used in the statute could be reasonably interpreted to include provisions pertaining to the gift tax. Here, however, there is no such indication that the consideration received in a § 60(b)(5) transaction is exempt from the proper calculation of ANBI. We find only that § 1804(e)(4) provides for the exemption from the normal affiliation and other administrative rules that would adversely affect an ANC's ability to sell its losses and credits.