**DOYON, LIMITED, Plaintiff–Appellant,**

v.

**UNITED STATES, Defendant–Appellee.**

**Nos. 97–5049, 99–5010, 99–5154.**

United States Court of Appeals, Federal Circuit.

June 2, 2000

Rehearing Denied Aug. 11, 2000

---

J. Roger Mentz, Judd C. Lawler, White & Case LLP, of Washington, DC, argued for plaintiff-appellant. With him on the brief were Christopher M. Curran and Peter J. Carney.

Michelle B. O'Connor, Attorney, Tax Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Loretta C. Argrett, Assistant Attorney General and Gilbert S. Rothenberg, Attorney.

Before NEWMAN, SCHALL, and GAJARSA, Circuit Judges.

Opinion for the court filed by Circuit Judge GAJARSA. Circuit Judge SCHALL dissents.

## DECISION

GAJARSA, Circuit Judge.

Doyon, Limited ("Doyon") appeals from the decisions of the United States Court of Federal Claims denying a refund for corporate income and environmental taxes because certain tax sharing payments received by Doyon were neither "Federal income taxes" nor "inter-company payments," and therefore not excludable from Doyon's book income for purposes of the alternative minimum tax. *See Doyon, Ltd. v. United States,* 37 Fed.Cl. 10 (1996); *Doyon, Ltd. v. United States,* 42 Fed.Cl. 175 (1998). Additionally, the Court of Federal Claims held that § 1804(e)(4) of the Tax Reform Act of 1986 did not prohibit the tax sharing payments from being subject to the alternative minimum tax ("AMT") or environmental tax. *See Doyon, Ltd.,* 37 Fed.Cl. at 25. For the reasons set forth below, we reverse and remand.

## BACKGROUND

In 1971, Congress passed the Alaska Native Claims Settlement Act ("ANCSA") to provide a grant of land and money to Native Alaskans in return for extinguishing their land claims within the state of Alaska. *See* Pub.L. No. 92–203, 85 Stat. 688 (1971) (codified at 43 U.S.C. §§ 1601–1629 (1994)). *See also* H.R. Rep. No. 523, 92nd Cong., 1st Sess., *reprinted in* 1971 U.S.C.C.A.N. 2192, 2193. Pursuant to the ANCSA, thirteen regional Alaska Native Corporations, organized under Alaska state law, were created to assist Native Alaskans in managing the assets transferred to them. These assets included 44 million acres of land selected within certain aboriginal areas and $962.5 million in monetary payments. *See* 43 U.S.C. §§ 1605, 1611. Doyon, created in 1972, is one of these thirteen Native Corporations.

By the mid–1980s, due in large measure to delay caused by Congressional inaction in providing title to the land that had been selected by the Native Corporations, many of the Native Corporations were in severe financial difficulties. The various Native Corporations incurred substantial operating losses during this period, bringing some to the verge of bankruptcy. In an attempt to alleviate some of these fiscal problems, Congress enacted § 60(b)(5) of the Deficit Reduction Act of 1984 ("DEFRA 1984"), which afforded special tax treatment for the Native Corporations. *See* Pub.L. No. 98–369, 98 Stat. 494, 579 ("The amendments made by subsection (a) [restricting the ability of companies to affiliate for tax purposes] shall not apply to any [Native Corporation] during any taxable year beginning before 1992 or any part thereof...."). The effect of § 60(b)(5) was to exempt Native Corporations from rules prohibiting unrelated corporations to affiliate for tax sharing purposes. Thus, § 60(b)(5) was designed specifically to allow Native Corporations to affiliate with profitable but unrelated companies so that the Native Corporations could exchange net operating losses ("NOL's") and investment tax credits ("ITC's") for a portion of the tax benefits realized by the profitable companies.[1]

Prior to 1986, in spite of the clear Congressional statutory intent, the Internal Revenue Service ("IRS") used its authority under I.R.C. § 269 (relating to disallowance of deductions or credits following a tax-avoidance motivated acquisition) and I.R.C. § 482 (relating to the IRS's authority to reallocate income among commonly controlled businesses), to prohibit Native Corporations from using the mechanism expressly provided by § 60(b)(5) of DEFRA 1984. Congress responded to the IRS by passing § 1804(e)(4) of the Tax Reform Act of 1986, which provided:

> no provision of the Internal Revenue Code of 1986 (including sections 269 and 482) or principle of law shall apply to deny the benefit or use of losses incurred or credits earned by [a Native Corporation] to the affiliated group of which the [Native Corporation] is the common parent.

Pub.L. No. 99–514, § 1804(e)(4), 100 Stat. 2085, 2801. This legislation was intended to prevent the IRS from objecting to affiliations of Native Corporations and profitable companies on the grounds that they lacked economic substance or business purpose. As a result of this specific statute, Native Corporations were finally permitted to affiliate with unrelated profitable companies solely for the purpose of tax sharing arrangements.

Doyon, like other Native Corporations, suffered severe financial difficulties during the 1980s. In fact, at the close of its 1987 taxable year, Doyon had an NOL carry forward of over $237 million. Doyon sought to take advantage of the benefits

---

**1.** Congress repealed § 60(b)(5) of DEFRA 1984 in 1988, but provided a grandfather clause for existing contracts up to a maximum of $40 million. *See* Technical and Miscellaneous Revenue Act of 1988, Pub.L. No. 100–647, § 5021, 102 Stat. 3342, 3666. The transactions at issue here have been modified by agreement of both parties to fall within the grandfather provisions, and therefore, are governed by § 60(b)(5) of DEFRA 1984.

provided by § 60(b)(5) of DEFRA 1984 and § 1804(e)(4) of the Tax Reform Act of 1986 by entering into several transactions with profitable companies during its 1987 and 1988 taxable years. In particular, Doyon contracted with the Marriott Corporation ("Marriott"), Campbell Soup Company ("Campbell"), and the Hilton Hotels Corporation ("Hilton"). The mechanics of the transactions are summarized below.[2]

## A. Marriott Transaction

In fiscal year 1987, Doyon entered into a tax sharing transaction with Marriott. To effect the transaction, Marriott created a subsidiary named Second Marigold, Inc. ("Marigold"). Doyon purchased 100 shares of Marigold's Class A common stock, which was sufficient to permit Marigold to become a member of an affiliated group with Doyon as the common parent, for $5,000. See § 60(b)(5) of DEFRA 1984. During this period of affiliation between Doyon and Marigold, Marriott assigned $33.7 million of income to Marigold. For the 1987 taxable year, Doyon filed a consolidated tax return for the group including itself and affiliates such as Marigold, in which Doyon reported as income the $33.7 million assigned by Marriott to Marigold. Doyon's NOL's and ITC's were able to offset this $33.7 million of income, thereby "sheltering" the income from tax liability. Marriott then purchased back the 100 shares of Marigold stock from Doyon for $6,000. Pursuant to a tax sharing agreement entered into at the inception of the transaction, Marigold agreed to pay Doyon 36.8 cents for each dollar of loss or deduction available for use, and 80 cents for each dollar of ITC available for use.[3] As a result of this transaction, Doyon received about $12 million in tax sharing payments from Marigold.

**2.** For a more detailed discussion of these transactions, see *Doyon, Ltd.,* 37 Fed.Cl. at 13–16 (1996).

**3.** In June of 1988, the IRS issued a private letter ruling granting approval for Doyon and

## B. Campbell Transaction

The Campbell transaction was structured in a similar manner as the Marriott transaction. In fiscal year 1987, Campbell created a subsidiary, CSC Alaska I ("CSC"), and Doyon purchased 2,000 shares of CSC's voting preferred stock, which allowed CSC to become a member of Doyon's affiliated group. Campbell then assigned $100 million of income to CSC. Because of CSC's affiliation with Doyon, Doyon was able to report this $100 million as income on its consolidated tax return. Once again, Doyon's NOL's and ITC's sheltered this income from tax liability. Campbell then purchased back the CSC stock. As a result of this transaction, Doyon received $39 million in tax sharing payments from CSC.

## C. Hilton Transactions

During the 1988 fiscal year, Doyon entered into two separate transactions with Hilton. For the first transaction, Hilton created a subsidiary, HIL–A VII Corp. ("Corp. VII"), which Hilton capitalized with a promissory note. Corp. VII transferred the note to a limited partnership, in exchange for a limited partnership interest. Pursuant to the partnership agreement, limited partners like Corp. VII were allocated 99 percent of the partnership's income. To permit inclusion of this partnership income on its consolidated tax return, Doyon purchased 100 shares of Corp. VII's Class A common stock for $100. During the period of affiliation, Corp. VII received partnership allocations of $40 million, which Doyon included on its tax return for 1988 to be offset by its NOL's and ITC's. Hilton then repurchased the Corp. VII stock for $101. Pursuant to a tax sharing agreement, Doyon received $14 million from Corp. VII in this transaction.

its affiliates to elect the method for allocating the consolidated federal tax liability among members of the affiliated group.

The second Hilton transaction was structured in a substantially similar way as the first. As before, Hilton capitalized a newly-formed subsidiary, HILA Corp. I ("Corp. I"), with a promissory note, which was then transferred to a limited partnership. Doyon purchased 100 shares of Corp. I stock to allow $40 million of partnership allocations to be included as income on its consolidated tax return. The Corp. I stock was later repurchased by Hilton. In this fashion, Doyon was able to offset the $40 million of partnership allocation with its remaining NOL's and ITC's on its 1988 tax return. Doyon received a tax sharing payment of $11.2 million from Corp. I for this transaction.

### D. Doyon's 1988 Taxable Year

As a result of the four transactions described above, Doyon received tax sharing payments totaling $76.6 million. Of this total, $6.1 million was reported to Doyon's shareholders as "[n]et proceeds from disposition of future tax benefits" in Doyon's 1987 Annual Report. The remaining $70.5 million was similarly reported in the 1988 Annual Report.

Only the 1988 taxable year is relevant to this appeal. In 1988, Doyon filed a consolidated tax return reporting as its income all of the assigned income attributable to its affiliates from the Hilton transaction, Corp. VII and Corp. I. Because Doyon's NOL's exceeded the group's taxable income, Doyon and its affiliates incurred no income tax liability. However, as part of the Tax Reform Act of 1986, Congress enacted legislation related to the corporate AMT. Pub.L. No. 99–514, § 701, 100 Stat. 2085, 2320 (codified at I.R.C. §§ 55–59). The new AMT provisions impacted Doyon's 1988 tax return by requiring it to pay some tax, despite the fact that it had sufficient NOL's to reduce its regular tax liability to zero. Thus, Doyon calculated its

1988 AMT and reported an AMT liability of $1,858,473. In addition, Doyon paid an environmental tax liability of $109,108.[4]

On audit, the IRS examined the four tax-sharing arrangements described above. The IRS determined that Doyon had incorrectly computed its AMT liability for 1988. In particular, the IRS asserted that the $70.5 million that Doyon received in the form of tax sharing payments and reported in its 1988 Annual Report should have been included in the AMT calculation because it was "book income." *See* I.R.C. § 56(c)(1)(A). Therefore, according to the IRS, Doyon's actual AMT liability for 1988 was $2,476,201.[5] Doyon then paid its taxes in full for the 1988 taxable year, and filed an administrative claim for a refund, seeking an exclusion of the $70.5 million from its book income. After the administrative claim was denied, Doyon sued for a refund at the Court of Federal Claims.

At the Court of Federal Claims, Doyon asserted that the disputed $70.5 million should be excluded from book income because of I.R.C. § 56(f)(2)(B), which states that "[book income] shall be . . . adjusted to disregard any Federal income taxes." According to Doyon, the $70.5 million was an item of tax benefit received as a result of transactions clearly authorized by Congress. Thus, this sum is properly excluded from book income as an item of "Federal income tax." Alternatively, Doyon contended that even if the $70.5 million was not an item of Federal income tax, the $25.2 million that Doyon received from Hilton should be considered an "inter-company payment," and thus properly excludable from book income. *See* Treas. Reg. § 1.56–1(d)(6). Finally, Doyon argued that even if the book income provisions of the I.R.C. did not require the exclusion of the tax sharing payments from AMT liability, § 1804(e)(4) of Tax Reform Act of

---

4. Environmental tax liability is relevant only because its calculation is based on alternative minimum taxable income. *See* I.R.C. § 59A(b). Thus, any change in this amount will also change the amount of environmental tax. *See Doyon, Ltd.,* 37 Fed.Cl. at 18 n. 28.

5. In addition to the AMT liability, the IRS determined that Doyon's environmental tax liability was $146,260.

1986 prohibited the IRS from "deny[ing] the benefit ... of losses incurred" by a Native Corporation by imposing AMT on those payments.

In denying Doyon's claim, the court ruled that, as a matter of law, the payments received by Doyon were not Federal income taxes, and thus were not excludable from book income. The court granted summary judgment to the United States on that issue. For the second issue, whether the $25.2 million received from Hilton were "inter-company payments," the court held a trial to determine the actual source of the funds paid to Doyon. After the trial, the court found that the money "actually" came from Hilton and not the subsidiaries. Therefore, the payments received by Doyon were not "intercompany payments." Finally, the court held that § 1804(e)(4) of the Tax Reform Act of 1986 did not prohibit the IRS from imposing AMT liability on tax sharing payments received by Doyon pursuant to transactions for the "sale" of NOL's and ITC's. This appeal followed.

## DISCUSSION

### A. Standard of Review

■ The outcome of this case turns entirely upon the interpretation of two sections of the Tax Reform Act of 1986—the "book income provisions" of the alternative minimum tax, codified at I.R.C. § 56(f), and § 1804(e)(4), prohibiting the IRS from denying Native Corporations the benefit of their losses. We review issues of statutory interpretation *de novo. See Abbott v. United States,* 204 F.3d 1099, 1101 (Fed. Cir.2000). The objective when interpreting statutes is to give effect to the intent of Congress. *See In re Portola Packaging, Inc.,* 110 F.3d 786, 788 (Fed.Cir.1997). To determine the Congressional intent, we begin, of course, with the language of the statutes at issue. *See Toibb v. Radloff,* 501 U.S. 157, 162, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991). However, to fully understand the meaning of a statute, we look "not only to the particular statutory language, but to the design of the statute as a

whole and to its object and policy." *Crandon v. United States,* 494 U.S. 152, 158, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990). Finally, in addition to the trust responsibility owed to the Native Alaskans by the United States, *see, e.g., Seminole Nation v. United States,* 316 U.S. 286, 296–97, 62 S.Ct. 1049, 86 L.Ed. 1480 (1941), which Congress was clearly fulfilling by its actions, we must also bear in mind that "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Montana v. Blackfeet Tribe of Indians,* 471 U.S. 759, 766, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985); *see also Choate v. Trapp,* 224 U.S. 665, 675, 32 S.Ct. 565, 56 L.Ed. 941 (1912) (holding that although tax exemptions generally are to be construed narrowly, in "the Government's dealings with the Indians the rule is exactly the contrary. The *construction,* instead of being strict, is liberal."). With this framework in mind, we turn to the relevant statutes.

### B. The Alternative Minimum Tax

The AMT provisions at issue here were enacted as part of the Tax Reform Act of 1986, Pub.L. No. 99–514, § 701, 100 Stat. 2085, 2320 (codified at I.R.C. §§ 55–59). Congress determined that the then-existing minimum tax on corporations needed to be modified so that corporations which were prospering but were able to structure their affairs to eliminate significant federal income tax—a practice widely perceived as unfair—would incur some federal tax liability. *See General Explanation of the Tax Reform Act of 1986,* 99th Cong., 2d Sess., 433 (1987) ("[B]oth the perception and reality of fairness have been harmed by instances in which corporations paid little or no tax in years when they reported substantial earnings."). Thus, the changes enacted in 1986 effectively created a separate tax system in addition to the ordinary corporate income tax. *See* I.R.C. § 55. At the times relevant to this dispute, AMT was calculated at a rate of 20 percent of a corporation's alternative minimum taxable income ("AMTI"), and was paid only if it exceeded a corporation's regular income

tax liability. *See id.* AMTI was intended to be a broader measure of economic income than taxable income. To compute AMTI, one starts with a corporation's taxable income and adds certain statutory adjustments, such as reversing a portion of the benefit of accelerated depreciation and adding income from installment sales that is deferred under the ordinary income tax. *See id.* § 56. Most relevant to this case, however, are the adjustments made to take into account the book income of a corporation.

The book income adjustment provides that AMTI would increase by 50 percent of the amount by which book income exceeds the corporation's AMTI, as computed without regard to the book income provision. *See id.* § 56(f)(1). Book income is defined by the code as "net income ... of a taxpayer set forth on the taxpayer's applicable financial statement." *Id.* § 56(f)(2)(A). Thus, as a general matter, items of income reported in a company's Annual Report, such as Doyon's disputed $70.5 million in tax sharing payments, would be included as book income. However, Doyon contends that the $70.5 million should be excluded from book income and should not be subject to taxation under the AMT regime. Specifically, Doyon claims that § 1804(e)(4) of the Tax Reform Act of 1986, adopted to allow Doyon to affiliate with profitable companies for tax sharing purposes, prevents the IRS from assessing AMT on payments received as a result of such transactions. Thus, we must determine how the AMT, particularly its book income provisions, relates to § 1804(e)(4).[6]

### C. Section 1804(e)(4) of the Tax Reform Act of 1986

Like the AMT provisions, § 1804(e)(4) was enacted as part of the Tax Reform Act of 1986. The language of § 1804(e)(4) was sweeping in its breadth—"*no provision of the Internal Revenue Code* of 1986 ... or principle of law *shall apply to deny the benefit or use of losses* incurred or credits earned by [a Native Corporation] to the affiliated group of which the [Native Corporation] is the common parent." (emphasis added). As discussed above, § 1804(e)(4) was adopted to require the IRS to respect transactions entered into pursuant to § 60(b)(5) of DEFRA 1984. Congress initially passed § 60(b)(5) of DEFRA 1984 in order to exempt Native Corporations from affiliation rules to allow them to "sell" NOL's for tax sharing payments. Despite this clear Congressional mandate, the IRS continued to block these affiliations using either I.R.C. § 269 or § 482. Congress enacted § 1804(e)(4) of the Tax Reform Act of 1986 in response to this practice by the IRS. However, rather than simply passing a statute that prohibited the specific practice that led to its enactment, Congress crafted a statute that was broadly drawn, and that prohibits the IRS from using any statutory or judge-made provision of the tax law to deny the benefit or use of losses of Native Corporations.

The plain meaning of the language used demands the broad applicability of the statute. First, the statute applies to *any* provision of the tax code or principle of law. Thus, Congress clearly intended to address more than simply the assignment of income doctrine or the IRS's power to disallow deductions after a tax avoidance motivated acquisition. While Congress was certainly concerned with these doctrines, hence the explicit reference to I.R.C. §§ 269, 482, the statute must be applied to any provision of the tax law. Second, the statute prohibits the denial of

---

**6.** Doyon also argues that the $ 70.5 million should be treated as "Federal income tax," which is excludable from book income under § 56(f)(2)(B). *See id.* (providing that book income "shall be appropriately adjusted to disregard any Federal incomes taxes....."). Alternatively, Doyon argues that the $25.2 million in tax sharing payments received from the Hilton transactions in 1988 should be excluded as an "inter-company" payment. *See* Treas. Reg. § 1.56–1(d)(6) (allowing inter-company payments to be eliminated using a consolidated elimination entry). Given our resolution of the case, we need not address these arguments for exclusion.

the "benefit *or* use" of losses. This disjunctive language indicates that the statute applies not only to allow the underlying transaction to take place, i.e. the "use" of losses, but also to protect the subsequent "benefit" that those losses may generate.

The breadth of § 1804(e)(4) is further confirmed by its legislative history. For example, Senator Stevens of Alaska explained that § 1804(e)(4) provided "broad based relief" and that "the term 'principle of law' is to be interpreted broadly." 132 Cong. Rec. S13,932 (daily ed. Sept 27, 1986) (statement of Sen. Stevens). The House Committee Report indicated that benefit of losses "may not be denied *in whole or in part* by ... any provision of the Internal Revenue Code." H.R. Rep. No. 841, 99th Cong., 2d. Sess., II–843, *reprinted in* 1986 U.S.C.C.A.N. 4075, 4931. Thus, Congress intended § 1804(e)(4) to prevent the benefit or use of losses from being denied to Native Corporations, whether this denial is caused by §§ 269 or 482 or by any other principle of law.

■ Despite the broad statutory language, the Court of Federal Claims held that this section did not apply to the AMT provisions. The court held that § 1804(e)(4) was limited to prohibiting the IRS from invalidating the underlying transaction that resulted in the tax sharing payments, or from imposing "administrative regulations" that fail to recognize the special circumstances surrounding these transactions. *See Doyon, Ltd.*, 37 Fed.Cl. at 27. Limiting the applicability of § 1804(e)(4) in this fashion is contrary to the plain language of the statute. Section 1804(e)(4) applies to the AMT and its book income provisions because these are "provisions of the Internal Revenue Code." While it appears that the AMT was not part of the impetus for passing § 1804(e)(4), the AMT falls within the scope of the broad statutory language.

Given that § 1804(e)(4) is applicable to the AMT, we must determine whether imposing AMT liability on the disputed tax sharing payments denies the benefit of losses. In other words, is the affiliated group of which Doyon is the common parent being denied the benefit of losses incurred by Doyon when it is required to pay back a certain portion of the tax sharing payments in the form of AMT? We hold that it is.

Section 1804(e)(4) prohibits the IRS from using any statute or principle of law to deny the "benefit or use" of losses incurred by the Native Corporation to the affiliated group that has a Native Corporation as its common parent. In passing both § 1804(e)(4) and § 60(b)(5) of DE-FRA 1984, Congress recognized that one of the "benefits" of the large NOL's that Doyon and other Native Corporations carried was that those NOL's could be monetized. *See, e.g.,* 132 Cong. Rec. S8175 (daily ed. June 23, 1986) (statement of Sen. Stevens) (stating that the purpose of § 60(b)(5) was to allow Native Corporations to raise money by selling NOL's to profitable companies in return for a share of the tax benefit gained by the profitable companies). A desire to allow the Native Corporations to obtain an "infusion of capital" from selling NOL's was at the heart of this legislation. *Id.* Clearly, the money received by the Native Corporations in transactions with profitable corporations was a Congressionally recognized "benefit" of those losses.

The Court of Federal Claims concluded that the "benefit" of the losses referred to in § 1804(e)(4) referred only to the right to use the losses in a transaction with a profitable company free of undue administrative regulations. *See Doyon Ltd.,* 37 Fed. Cl. at 27. This restrictive conclusion is untenable. If Congress had intended such a limited effect, it could have crafted a more narrowly tailored statute. Rather, Congress passed a broad statute that, by its terms, not only prevents the IRS from denying the underlying transaction, but also prevents the IRS from denying the benefit of such transactions.

Finally, the fact that Doyon is able to maintain a portion of the benefit of the transactions at issue here is of no moment.

By requiring Doyon to pay a portion of the tax sharing payment over to the Government in the form of AMT, the IRS has denied at least a portion of the "benefit" of Doyon's losses. Section 1804(e)(4) is not limited to situations where there is a full denial of benefit. *See* H.R. Rep. 841, 99th Cong., 2d. Sess., II–843, *reprinted in* 1986 U.S.C.C.A.N. 4075, 4928 (stating that "the benefit of such losses ... may not be denied in whole or *in part*."). The IRS is prohibited from denying any of the benefit of Native Corporation losses. Therefore, § 1804(e)(4) is violated by requiring tax sharing payments generated by transactions under § 60(b)(5) of DEFRA 1984 to be included in book income for AMT purposes.

Because we find that the disputed tax sharing payment must be excluded from book income due to § 1804(e)(4) of the Tax Reform Act of 1986, we need not address whether this sum is excludable under other sections of the tax code.

## CONCLUSION

Section 1804(e)(4) of the Tax Reform Act of 1986 prohibits the IRS from requiring Doyon to pay AMT and environmental tax on tax sharing payments received in transactions contemplated by § 60(b)(5) of DEFRA 1984. Therefore, the disputed $70.5 million should have been excluded from Doyon's book income for the 1988 taxable year, and we remand for a calculation of the appropriate refund, with interest. We *REVERSE AND REMAND.*

## COSTS

Costs to Doyon.

SCHALL, Circuit Judge, dissenting.

I respectfully dissent because I am unable to agree that § 1804(e)(4) of the Tax Reform Act of 1986 prohibited the IRS from requiring Doyon to pay the AMT on tax sharing payments that it received in transactions authorized by § 60(b)(5) of DEFRA 1984.

### I

The majority holds that § 1804(e)(4) created a tax exemption for Native Corporations by excluding tax sharing payments from book income for purposes of computing the AMT. In reaching this holding, it concludes that the language of § 1804(e)(4) ("[N]o provision of the Internal Revenue Code of 1986 ... or principle of law shall apply to deny the benefit or use of losses incurred or credits earned by [a Native Corporation] to the affiliated group of which the Native Corporation is the common parent.") meant that the statute applied to any provision of the tax code or principle of law, including the AMT. It also concludes that the word "benefit" in § 1804(e)(4) meant the "subsequent 'benefit'" of the amount of money received through the sale of NOL's and ITC's by Native Corporations. Because paying taxes on tax sharing payments reduced the total amount of money received by Native Corporations from engaging in tax sharing transactions, the majority reasons, Native Corporations were denied the "benefit" of engaging in affiliated transactions. My problem with the majority's holding is that I believe it runs afoul of the intent of Congress in enacting § 1804(e)(4).

### II

"The ultimate objective when interpreting a statute is to give effect to the intent of Congress." *In re Portola Packaging, Inc.*, 110 F.3d 786, 788 (Fed.Cir.1997). Statutory interpretation begins with the language of the statute. *See VE Holding Corp. v. Johnson Gas Appliance Co.*, 917 F.2d 1574, 1579 (Fed.Cir.1990). However, "'we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy.'" *In re Portola Packaging*, 110 F.3d at 788 (quoting *Crandon v. United States*, 494 U.S. 152, 158, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990)).

Congress passed § 60(b)(5) of DEFRA 1984 in order to exempt Native Corporations from the normal affiliation rules, so

that they could sell their NOL's and ITC's to profitable companies for tax sharing purposes. Then, after the IRS thwarted that goal, Congress enacted § 1804(e)(4). It did so to prohibit what the IRS was doing (blocking Native Corporations from engaging in the desired tax sharing transactions). However, neither the statute nor the legislative history suggests that Congress intended to create a tax exemption for Native Corporations when it enacted § 1804(e)(4). Indeed, the majority very fairly acknowledges that "it appears that the AMT was not part of the impetus for passing § 1804(e)(4)." Moreover, § 56 of the Internal Revenue Code, entitled "Adjustments in computing alternative minimum taxable income," was enacted at the same time as § 1804(e)(4). *See* Tax Reform Act of 1986, Pub.L. No. 99–574, 100 Stat. 2085, 2328, 2801. Section 56(f)(2)(G), entitled "Rules for Alaska native corporations," specifically allows certain adjustments to be made to the "adjusted net book income" of a Native Corporation. 26 U.S.C. § 56(f)(2)(G). However, § 56(f)(2)(G) has never allowed adjustments to be made to book income based upon tax sharing transactions conducted under the authority of § 1804(e)(4) of the Tax Reform Act of 1986 or § 60(b)(5) of DEFRA 1984. Had Congress contemplated the exemption urged by Doyon, it is reasonable to expect that it would have made provision for it in § 56.

The majority states that we must bear in mind that "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Montana v. Blackfeet Tribe of Indians,* 471 U.S. 759, 766, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985). The majority also cites *Choate v. Trapp,* 224 U.S. 665, 675, 32 S.Ct. 565, 56 L.Ed. 941 (1912) (holding that although tax exemptions generally are to be construed narrowly, in "the Government's dealings with the Indians the rule is exactly the contrary. The construction, instead of being strict, is liberal."). According to the majority, it is within this framework that Doyon's claim for a refund must be viewed. What I will refer to as

the "Indian canon of construction" is a well-established doctrine. Indeed, it was recently applied by this court in *Little Six, Inc. v. United States,* 210 F.3d 1361 (Fed. Cir.2000), where we construed ambiguous language in 25 U.S.C. § 2719(d)(1) in favor of an Indian tribe and its wholly-owned corporation in holding that the tribe and the corporation were exempt from the payment of federal wagering taxes. In my view, however, the Indian canon of construction does not apply in this case.

"Indians ... are subject to the payment of income taxes as are other citizens.... [T]o be valid, exemptions to tax laws should be clearly expressed." *Squire v. Capoeman,* 351 U.S. 1, 6, 76 S.Ct. 611, 100 L.Ed. 883 (1956). Moreover, "[t]he canon of construction regarding the resolution of ambiguities in favor of Indians ... does not permit reliance on ambiguities that do not exist; nor does it permit disregard of the clearly expressed intent of Congress." *South Carolina v. Catawba Indian Tribe, Inc.,* 476 U.S. 498, 506, 106 S.Ct. 2039, 90 L.Ed.2d 490 (1986).

In this case there is simply no indication that, when Congress enacted § 1804(e)(4), it intended to grant Native Corporations an exemption from the AMT. Quite simply, all Congress did was enact legislation for a clearly defined purpose, and that purpose did not include granting a tax exemption. In short, there is no tax exemption provision whose language—assuming it to be ambiguous—is to be construed in favor of Native Corporations. *See Cook v. United States,* 86 F.3d 1095, 1097 (Fed.Cir.1996) ("Absent a definitely expressed exemption, Indians, like all other United States citizens, are subject to federal taxation."). Under these circumstances, the predicate for application of the Indian canon of construction is missing. Thus, we are left with the normal rules of statutory construction. In my view, application of those rules compels the conclusion that § 1804(e)(4) does not confer a tax exemption upon Native Corporations. Finally, I believe that the Court of Federal Claims

did not err in rejecting Doyon's other arguments in support of its claim for a refund, *see* footnote 6 of the majority opinion. I therefore would affirm the court's decision.